IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

UMPQUA BANK,                            )
                                        )
            Plaintiff,                   )      TC-MD 110596N
                                        )
      v.                                 )
                                        )
LANE COUNTY ASSESSOR,                    )
                                        )
            Defendant.                   )      **DECISION**

Plaintiff appeals the real market value of property identified as Accounts 1411584,

1411592, 1411618, 1411600, and 1411626 for the 2010-11 tax year. A telephone trial was held

on March 5, 2012. Christopher K. Robinson appeared on behalf of Plaintiff. Bob Dant (Dant), a

real estate broker with 39 years of experience, and John Hammer (Hammer), principal in Knoll,

LLC, purchaser of the subject properties in July 2011, testified on behalf of Plaintiff. Roxanne

R. Gillespie (Gillespie), MAI, Appraisal Supervisor, appeared and testified on behalf of

Defendant. Plaintiff's Exhibits 2 through 7 and 9 through 13 were offered and admitted without

objection. Plaintiff's Rebuttal Exhibit 1 was offered and received over Defendant's objection.[1]

Defendant's Exhibit A was offered and received over Plaintiff's objection.[2]

## I. STATEMENT OF FACTS

The accounts at issue comprise the Westec Business Park (Westec) located on Willow

Creek Circle in Eugene, Oregon. (Def's Ex A at 10.) Westec is an industrial campus situated on

---

[1] Defendant objected, initially, based on the fact that Plaintiff's Rebuttal Exhibit 1 was prepared after the January 1, 2010, assessment date. Defendant revised its objection, focusing on the reliability of Plaintiff's Rebuttal Exhibit 1. The court admitted Plaintiff's Rebuttal Exhibit 1 noting that Defendant's objection goes to the weight.

[2] Plaintiff objected to Defendant's Exhibit A for a variety of reasons pertaining, primarily to its reliability. Plaintiff noted that Defendant's appraisal is based on mass appraisal techniques, is not in compliance with USPAP, and does not include market information relied on by Gillespie in reaching her conclusions. The court admitted Defendant's Exhibit A over Plaintiff's objection, noting that the issues raised by Plaintiff go to the exhibit's weight.

approximately 11.02 acres (480,031 square feet) including "[f]lex industrial/research and engineering * * * industrial space designed to allow flexible conversion of warehouse or manufacturing space to a higher percentage of office space." (*Id.* at 10, 38, 53, 67, 81.) The total improvements size of Westec is 85,600 square feet over five buildings.[3] (*See id.* at 90.) The buildings are identified as 1710, 1720, 1730, 1740, and 1750. (*See, e.g., id.*) The Westec buildings were constructed between 1985 and 1996. (*Id.* at 2, 34, 49, 63, 77.)

Dant testified that Westec is in a "tough location" on the edge of town; buses do not serve the area. Gillespie testified that Walmart, Target, and strip shopping centers with restaurants are located within a half mile of Westec; she disagrees with Dant's characterization of the location.

A.     *Plaintiff's value evidence: July 2011 sale and market conditions*

Dant testified that Plaintiff acquired the Westec properties by deed in lieu of foreclosure; the deed included no warranties. (Ptf's Ex 5 at 1.) He testified that Plaintiff initially listed the Westec properties for sale in October 2010 at a total price of $4,000,000 based on an appraisal. (*See* Ptf's Ex 2 (marketing flyer for the subject properties).) Dant testified that he inspected the Westec properties prior to listing them in October 2010. Dant testified that Plaintiff received the first letter of intent on December 22, 2010, for $2.2 million. (Ptf's Ex 3 (marketing history).) He testified that Plaintiff rejected that offer and then received a second offer of $2,525,000. (*Id.*)

Dant testified that Plaintiff received an offer to purchase one of the five properties for $700,000, so Plaintiff marketed the remaining four properties and received a $2 million offer; the offers for Westec totaled $2.7 million. He testified that the $2.7 million deal failed because the five-property plat was "an illusion"; it appeared as though the properties were subdivided, but the division was never sent to the city for approval. (*See* Ptf's Ex 4 (series of emails between the

---

[3] Hammer testified regarding the building sizes, which differed from those reported by Gillespie. Hammer testified that he determined the building sizes based on leases and the appraisal; he did not measure himself.

city and John Brown (Brown), representative of the potential buyer who offered to purchase one of the buildings, regarding the plat problem).) Dant testified that Brown determined that it would be costly and time-consuming to resolve the plat problem and subdivide Westec, so the potential sale was terminated. (*See id.* at 19.)

Dant testified that, because the Westec buildings could not be sold separately, Plaintiff sought to accept the offer of $2.525 million from Knoll, LLC. He testified that the price was reduced to $2.4 million because of deferred maintenance including failing/leaking roofs and mold concerns, discovered by the buyer. Dant testified that the deferred maintenance existing at the time of the offer would not have been different than as of January 1, 2010. The sale to Knoll, LLC, closed on July 28, 2011, for $2,400,000. (Ptf's Ex 5, 6.)

Hammer testified that he is a principal in Knoll, LLC, which purchased Westec from Plaintiff in July 2011. He testified that he was actively involved in purchase negotiations. Hammer testified that he inspected Westec prior to purchase, but he could not recall the exact date. He testified that during due diligence it was discovered that the ceilings and light fixtures were "antiquated," the carpets were old, the roofs suffered from "major issues," and extensive landscaping and exterior improvements were required to enhance "curb appeal." He testified that Westec did not meet "earthquake standards," necessitating subsequent tenant improvements and ceiling maintenance. Hammer testified that, subsequent to its purchase of Westec, Knoll, LLC, has spent about $70,000 repairing two roofs and will need to repair a third. He testified that Knoll, LLC, spent about $150,000 total on deferred maintenance in 2011, which does not include tenant improvements or build out.

Hammer testified that, following Knoll, LLC,'s purchase of Westec, it sold building 1740 to the Bernhardt Group for $651,487.50. (*See* Ptf's Ex 13 (seller's final closing statement).) He

testified that, in order to sell building 1740 to the Bernhardt Group, Knoll, LLC, had to spend about $15,000 to complete a "lot validation" subdividing the Westec properties.[4] (*See* Ptf's Ex 7.) Hammer testified that Knoll, LLC, offered to "carry" the financing for the sale of building 1740 to the Bernhardt Group, so the sale did not include appraisal fees and other such fees.[5] He testified that the acquisition of the Westec properties was very risky and Knoll, LLC, might not have proceeded if the Bernhardt Group was not interested in purchasing one of the buildings. Hammer testified that he anticipates at least five or ten years before the Westec properties begin to produce a cash flow; they are a "long term" investment.

Hammer testified that, during the due diligence period, the occupancy of the Westec properties was: 15 percent (building 1710), 20 percent (building 1720), and 100 percent (building 1730); buildings 1740 and 1750 were completely vacant. Hammer testified that subsequent to Knoll, LLC,'s purchase of the Westec properties in July 2011, some of the space had been leased and occupancy of the four buildings owned by Knoll, LLC, was around 40 percent. Dant testified that the Westec properties have experienced high vacancy since late 2008; occupancy was around 20 percent as of January 1, 2010. (*See* Ptf's Ex 12 (December 31, 2009, rent roll).) He testified that the high vacancy was due, in part, to closure of the nearby Hynix plant in 2008, which was adjacent to Westec and shared a property line. Dant testified that in

/ / /

/ / /

----

[4] Gillespie questioned how the lot subdivision approval occurred in August 2011, but the sale to Bernhardt reportedly closed in July 2011. Hammer could not provide an explanation.

[5] Hammer testified that Knoll, LLC, requested a 20 percent down payment from Bernhardt; banks typically require about 25 percent down. He testified that Knoll, LLC,'s creditor did not release the property purchased by Bernhardt from the loan. Gillespie questioned whether Bernhardt purchased a partial interest from Knoll, LLC, given that Knoll, LLC, still has a loan on the five subject properties.

2008 Hynix closed and the "downtown" market became very competitive because it offers shopping, restaurants, and other amenities within walking distance. (*See* Ptf's Ex 9.)

Hammer testified that, as of January 1, 2010, he experienced a lot of "give back" with his tenants; he had to decrease rents and make concessions in order to keep tenants. Gillespie questioned whether it was typical for the cost of tenant improvements to be amortized over the life of the lease. Hammer testified that, in his experience, the cost of tenant improvements are not typically passed on to tenants. He testified that the market as of January 1, 2010, was a "tenant's market." Hammer testified that Westec is primarily office space; office occupancy is harder to maintain in a downturn than retail or warehouse space. He testified that office space leases for more than warehouse space, but it also costs more to construct and finish. Hammer testified that market conditions did not change much between January 1, 2010, and July 2011.

B.    *Defendant's appraisal*

Gillespie testified that she completed an appraisal of Westec and determined the real market value of each property at stabilized occupancy. (Def's Ex A at 2-3, 34-35, 49-50, 63-64, 77-78.) Gillespie testified that as of January 1, 2010, the Westec properties were separate tax lots, even if not separate legal lots, and Defendant is required to value each tax lot separately for assessment and taxation purposes. She testified that she determined a separate value for each of the five accounts. Dant testified that whether the properties are on separate legal lots affects their marketability.

Gillespie testified that she relied on the income and sales comparison approaches; she determined the cost approach to be irrelevant given the age of the Westec properties. In

/ / /

/ / /

reconciliation, Gillespie gave the most weight to the income approach. (*See, e.g.,* Def's Ex A at 26.) The 2010-11 roll real market values and maximum assessed values as well as Gillespie's real market value conclusions for each of the five Westec properties are as follows:[6]

| Account | Building | Total SF | Defendant's 2010-11 RMV | 2010-11 RMV[7] | 2010-11 MAV[8] |
|---------|----------|----------|-------------------------|----------------|----------------|
| 1411584 | 1750 | 21,400 | $1,700,000 | $1,698,500 | $1,698,500 |
| 1411592 | 1710 | 14,200 | $1,129,000 | $1,128,410 | $1,217,675 |
| 1411618 | 1720 | 21,400 | $1,700,000 | $1,698,500 | $1,775,541 |
| 1411600 | 1730 | 14,400 | $1,148,000 | $1,141,390 | $1,505,903 |
| 1411626 | 1740 | 14,200 | $1,130,000 | $1,399,770 | $1,153,293 |
| **Total** | | | $6,807,000 | $7,066,570 | |

1.    *Sales comparison approach*

Gillespie identified five comparable sales that occurred between October 2006 and August 2011. (Def's Ex A at 23.) The sales ranged in size from 16,715 to 59,402 square feet. (*Id.*) Gillespie testified that the October 2006 sale for an adjusted price per square foot of $137.60 represents the high end of the range. (*Id.*) She testified that sales 4 and 5, in June 2009 and August 2011, respectively, are both located near Westec. (*Id.*) Those properties sold for adjusted prices of $110.58 and $78.23 per square foot, respectively. (*Id.*)

In determining a value for each of the five Westec properties under the sales comparison approach, Gillespie analyzed the land to building ratio as compared with her comparable sales. (*See, e.g.*, Def's Ex A at 23.) For buildings 1710, 1720, and 1750, Gillespie concluded $78 per

/ / /

/ / /

---

[6] (Def's Ex A at 90; Ptf's Compl at 2-6.)

[7] Real Market Value.

[8] Maximum Assessed Value.

square foot, for total real market values of $1,107,600, $1,669,200, and $1,669,200, respectively. (*Id.* at 23, 72, 86.) For buildings 1730 and 1740, Gillespie concluded $80 per square foot, for total real market values of $1,152,000 and $1,136,000, respectively. (*Id.* at 43, 58.)

2.     *Income approach*

Gillespie testified that the Westec properties were listed for lease as of January 1, 2009, at $0.75 per square foot per month, triple net. (Def's Ex A at 24.) Gillespie identified four rent comparables ranging from $0.50 to $0.80 per square foot per month, triple net, based on which she concluded rent of $0.62 per square foot per month. (*Id.* at 24, 45, 59, 73, 87.) Gillespie determined vacancy and collection loss of 10 percent, expenses of five percent, and a capitalization rate of 8.00 percent based on a "recent sale of 1500 Westec" and a Korpacz market survey reporting rates of "6.5 [percent] to 8.5 [percent] overall." (*See, e.g., id.* at 25.) She concluded real market values as follows: $1,129,000 for building 1710; $1,702,000 for building 1720; $1,145,000 for building 1730; $1,129,000 for building 1740; and $1,702,000 for building 1750. (*Id.* at 25, 46, 60, 74, 88.)

Dant testified in rebuttal that he completed an "economic analysis" for the Westec properties on November 22, 2010, as part of his marketing of those properties. (Ptf's Rebuttal Ex 1 at 1.) He testified that based on his conversations with market participants he concluded that $0.45 per square foot was reasonable rent in 2010. (*See id.*) Dant testified that he used 15 percent vacancy and that expenses, including taxes, when vacant are $3.00 per square foot, or $38,982 based on 15 percent vacancy. (*Id.*) He concluded a management expense of three percent and reserves of $0.25 per square foot per year, or $21,657.[9] (*Id.*) Using a capitalization rate of nine percent, Dant concluded a value of $3,611,630 for the Westec properties. (*Id.*) He

_____

[9] Dant determined the total size of the Westec properties to be 86,626 square feet. (Ptf's Rebuttal Ex 1 at 1.) Based on 85,600 square feet reported by Gillespie, reserves at $0.25 per square foot are $21,400.

testified that he subtracted tenant improvements of $10 per square foot for 63,118 square feet; leasing commissions at $5 per square foot for 63,118 square feet; expenses of $250,000 for "carry," which are expenses that must be paid when vacant; and $250,000 for entrepreneurial profit. (*Id*.) Dant concluded a value of $2,150,000, rounded, for the Westec properties. (*Id*.)

Plaintiff considers the July 2011 sale of Westec for $2.4 million to be the most reliable indication of the 2010-11 real market value of the Westec properties, and that is Plaintiff's requested real market value. Gillespie disagrees that the sale of the Westec properties in July 2011, was representative of its real market value as of January 1, 2010. Defendant requests that the roll real market values be sustained.

## II. ANALYSIS

The issue before the court is the real market values of the Westec properties for the 2010-11 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev*., 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."[10]

The assessment date for the 2010-11 tax year was January 1, 2010. ORS 308.007; ORS 308.210.

"Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2). There are three approaches of valuation that must be considered, although all three approaches may not

---

[10] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2009.

be applicable: the cost approach, the sales comparison approach, and the income approach. OAR 150-308.205-(A)(2)(a); *Allen v. Dept of Rev.* (*Allen*), 17 OTR 248, 252 (2003).

Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971) (citation omitted). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

A. *July 2011 sale of the Westec properties*

Plaintiff did not submit an appraisal report, relying instead on the July 2011, sale of the Westec properties. The lack of an appraisal is not fatal because "[t]he various approaches to valuation * * * are only the vehicles used to determine the ultimate fact -- market value." *Kem v. Dept. of Rev.* (*Kem*)*,* 267 Or 111, 114, 514 P2d 1335 (1973).

> "A recent sale of the property in question is important in determining its market value. If the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is very persuasive of the market value."

*Id*. (Citations omitted.) Gillespie questioned whether the July 2011 sale of the Westec properties is a reliable indicator of real market value given that it is a foreclosure sale.

Plaintiff provided a memorandum dated January 21, 2009, from the Oregon Department of Revenue to "All County Data Analysts, Assessors, and Appraisal Managers," the "purpose" of which is "to provide guidance to counties' appraisal staff on determining the types of sales that should be considered usable in this current atmosphere of an economically depressed market."

(Ptf's Ex 11 at 1.) It stated that, "[s]o long as the nominal standards for an acceptable comparable sale are met - arm's-length, voluntary, knowledgeable parties, exposure to the market, cash equivalent, etc. - such sales are appropriate to consider." (*Id.* at 2.)

> " 'Short sales' should be carefully reviewed to determine if they meet the relevant criteria for a comparable. The mere fact that there is, presumably, some duress on the part of the seller (the upside down owner) that prompts the sale, does not itself disqualify the transaction from consideration, especially when there is some duress in the market. This situation is analogous to the owner losing his job and selling because he can't make the mortgage payments. We wouldn't discount that sale simply because the owner was very motivated to sell (some duress) so long as the sale was arm's-length with adequate exposure and contained no unusual financing terms or elements that couldn't be adjusted out."

(*Id.*)

"This court has been reluctant to consider 'foreclosure' sales as 'arm's-length transactions' because such sales 'may well involve an element of compulsion on the part of the seller.' " *Voronaeff v. Crook County Assessor*, TC-MD No 110361C, WL 1426847 at *4 (Apr 25, 2012) (citations omitted). However, property purchased through foreclosure may be "a voluntary *bona fide* arm's-length transaction between a knowledgeable and willing buyer and a willing seller." *Ward v. Dept. of Revenue*, 293 Or 506, 508, 650 P2d 923 (1982). "There are narrow exceptions determined on a case-by-case basis to the holding that bank-owned property sales are not typically representative of real market value." *Brashnyk v. Lane County Assessor*, TC-MD No 110308, WL 6182028 at *5 (Dec 12, 2011). "[W]here the majority of the sales are distress, it would seem that that kind of sale would provide a more accurate reflection of the market." *Morrow Co. Grain Growers v. Dept. of Rev.*, 10 OTR 146, 148 (1985).

The court is not persuaded that the July 2011 sale of the Westec properties was an "accurate reflection of the market" as of January 1, 2010. The sale was not "recent" as of the January 1, 2010, assessment date. Plaintiff seeks to connect the July 2011 sale to the January 1,

2010, assessment date based on Hammer's testimony that market conditions did not change much between January 1, 2010, and July 2011. The court received no evidence supporting that testimony. The July 2011 sale was also a foreclosure sale. As discussed above, foreclosure sales and short sales may, in certain cases, serve as an "accurate reflection of the market." Here, however, Plaintiff has not presented any evidence that foreclosures and short sales characterize the market for the Westec properties. Plaintiff has not met its burden of proof.

Even though the burden has not shifted, "the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court[.]" ORS 305.412. Defendant presented evidence of the real market value of the Westec properties under the income and sales comparison approaches and Plaintiff provided some rebuttal evidence concerning Defendant's income approach. Defendant determined, and the court agrees, that the income approach should be given the most weight in this analysis.

B.      *Income approach*

"The income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream it produces." *Allen*, 17 OTR at 253 (citation omitted). "The direct capitalization method * * * focuses on two key components: (1) the capitalization rate * * * and (2) net operating income * * *." *Id.* "[Net operating income] is the currently expected net income of a property after all operating expenses are deducted from gross income. To calculate the [net operating income], appraisers look at historical gross income and expenses for the subject, adjusted by reference to market data." *Id.* at 254 (citation omitted). The parties dispute whether the Westec properties should be valued separately or collectively. Although Gillespie determined the real market value of each property separately under the income approach, the variables that she used did not differ for any of the

five properties. Thus, it makes no difference under the income approach whether the five properties are valued separately or collectively. For ease, the court considers them collectively.

Gillespie considered comparable leases and determined market rent of $0.62 per square foot per month for the Westec properties. Dant testified on rebuttal that he considered reasonable rent for the Westec properties to have been $0.45 per square foot per month as of November 2010. Dant presented no evidence in support of his determination of market rent. The court finds that Gillespie's rennet of $0.62 per square foot per month is supported by the evidence presented. Gillespie determined vacancy and collection loss of 10 percent. Dant and Hammer both testified that the actual vacancy of the Westec properties was around 20 percent as of January 1, 2010, and that the 2008 closure of Hynix affected vacancy rates in the area. Dant used a vacancy rate of 15 percent and the court agrees that 15 percent was reasonable for the Westec properties as of January 1, 2010.

Gillespie utilized expenses of five percent; it is unclear how she determined that rate. Dant determined expenses of three percent for management and $0.25 per square foot per for reserves. In light of the significant maintenance issues described by Hammer and his testimony that Knoll, LLC, has spent $150,000 subsequent to its purchase, the court accepts Dant's determination of expenses and reserves. Thus, the court concludes net operating income of $503,694 for the five Westec properties, collectively. Gillespie selected a capitalization rate of eight percent, based on comparable sales and market surveys. Dant selected a rate of nine percent, but presented no evidence in support of his conclusion. The court finds Gillespie's rate of eight percent to be persuasive based on the evidence presented.

The court finds that the 2010-11 real market value of the Westec properties, collectively, was $6,296,180, or $73.55 per square foot, rounded. Based on the square footage of each of the

five properties, the court finds that the 2010-11 real market values were as follows: $1,044,410 for building 1710 (Account 1411592); $1,573,970 for building 1720 (Account 1411618); $1,059,120 for building 1730 (Account 1411600); $1,044,410 for building 1740 (Account 1411626); and $1,573,970 for building 1750 (Account 1411584). Dant testified that deductions should be made for tenant improvements, leasing commissions, "carry," and entrepreneurial profit. Dant presented no evidence in support of those deductions and it is unclear how he determined the amount of each deduction. The court finds that the deductions requested by Dant are speculative and unsupported by the evidence presented.

### III. CONCLUSION

After carefully considering the testimony and evidence presented, the court finds that the July 2011 sale of the Westec properties was not "a recent, voluntary, arm's length transaction" as of the January 1, 2010, assessment date. Plaintiff failed to meet its burden of proof. Based on the evidence presented under the income approach, the court finds that the 2010-11 real market values of the Westec properties were $73.55 per square foot, as set forth above. Now, therefore,

IT IS THE DECISION OF THIS COURT that the real market value of property identified as Account 1411592 was $1,044,410 for the 2010-11 tax year.

IT IS FURTHER DECIDED that the real market value of property identified as Account 1411618 was $1,573,970 for the 2010-11 tax year.

IT IS FURTHER DECIDED that the real market value of property identified as Account 1411600 was $1,059,120 for the 2010-11 tax year.

/ / /

/ / /

/ / /

IT IS FURTHER DECIDED that the real market value of property identified as Account 1411626 was $1,044,410 for the 2010-11 tax year.

IT IS FURTHER DECIDED that the real market value of property identified as Account 1411584 was $1,573,970 for the 2010-11 tax year.

Dated this ___ day of July 2012.

ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Allison R. Boomer on July 17, 2012. The Court filed and entered this document on July 17, 2012.*